## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| INDEPENDENCE TUBE CORPORATION, ) | FILED: OCTOBER 21,2008 |
| ) | 08CV6023 |
| Plaintiff, ) | JUDGE ST.EVE |
| ) | MAGISTRATE JUDGE KEYS |
| v. ) | RCC |
| ) Case No. | |
| BANK OF AMERICA CORPORATION, ) | |
| BANC OF AMERICA INVESTMENT ) | |
| SERVICES, INC. and BANC OF AMERICA ) | **JURY TRIAL DEMAND** |
| SECURITIES, LLC., ) | |
| ) | |
| Defendants. | |

## COMPLAINT

Bank of America misrepresented to Independence Tube Corporation ("ITC" or "Independence Tube"), and thousands of other investors, that Auction Rate Securities ("ARS") were safe, liquid, short-term cash equivalents that were an attractive alternative to money market investments. The ARS market, however, "froze" and essentially collapsed in February 2008, leaving ITC and thousands of other investors unable to liquidate over $300 billion in unsellable securities. The ARS market failed because Bank of America, and other broker-dealers, misrepresented the nature of ARS investments, failed to disclose the role it played in manipulating the ARS market, and misrepresented the reliability of the ARS market. The market immediately collapsed after Bank of America, and other broker-dealers, refused to continue artificially supporting and manipulating the market to maintain the appearance of liquidity and stability.

ITC is forced to file this lawsuit even though Bank of America has essentially already *twice* admitted wrong doing. First, Bank of America tacitly admitted its role in the ARS market collapse and has agreed in principle to settle claims arising from an investigation by the Massachusetts Securities Division. Less than one month later, Bank of America again agreed in

185735

principle to settle ARS-related claims brought by the Securities and Exchange Commission ("SEC"), New York Attorney General, and other regulators. Bank of America agreed to pay a $50 million penalty and to repurchase approximately $4.7 billion in illiquid ARS from individuals and businesses that held accounts valued up to $15 million or charities with accounts valued up to $25 million.

ITC, however, was left out of these settlements because it purchased nearly $23 million in now-illiquid ARS from Bank of America. Despite agreeing to settle claims where thousands of investors will be made whole, Bank of America patently refuses to repurchase ITC's illiquid ARS.

In this action, ITC seeks rescission and damages for violations of the Investment Advisers Act of 1940, the Illinois Securities Act, fraud, breach of fiduciary duty, and negligent misrepresentation.

In support of its claims, ITC states as follows:

**<u>NATURE OF CASE</u>**

1.      This case arises from Bank of America's actions as an investment advisor for ITC.

2.      ITC enjoyed a relationship of trust and confidence with Bank of America.

3.      Bank of America, as ITC's investment advisor, improperly advised ITC to purchase approximately $22,900,000 in unsuitable and illiquid investments called "Auction Rate Securities" ("ARS"). ARS are bonds with interest rates that are reset through periodic auctions.

4.      Bank of America represented to ITC that ARS were highly liquid, safe investments, that were equivalent to cash or money market funds. Those representations were

false and known to be false by Bank of America. Bank of America knew that ITC would and did rely on those representations.

5. Bank of America knew, but failed to disclose to ITC, material facts about ARS. Bank of America specifically failed to disclose that ARS were not cash alternatives. Rather, ARS were complex, long-term financial instruments.

6. Bank of America knew, but failed to disclose that ARS were only liquid at the time of sale because Bank of America was artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability. Bank of America knew, but failed to disclose that ARS would become illiquid as soon as Bank of America, and other major broker-dealers, stopped maintaining the auction market.

7. Bank of America provided ITC with investment material that it knew, or recklessly disregarded, as being false and misleading regarding ARS.

8. On February 13, 2008, 87% of all ARS auctions failed when Bank of America and other major broker-dealers refused to continue to support the auctions. As a result of the withdrawal of support by all of the major broker-dealers, the ARS market collapsed. ITC and other holders were left with more than $300 billion in ARS with no means of liquidating the investments.

9. ITC was specifically left with nearly $23 million in ARS that Bank of America had offered and sold as a suitable alternative to other short term cash management vehicles.

## PARTIES

10.     Plaintiff Independence Tube Corporation ("ITC") is an Illinois corporation with its headquarters located in Chicago, Illinois.  ITC is a leading manufacturer of square and rectangular structural steel tubing.

11.     Defendant Bank of America Corporation is a North Carolina corporation headquartered in Charlotte, North Carolina.  Bank of America Corporation is a bank holding company and financial holding company registered under the Gramm-Leach-Bliley Act.  Bank of America Corporation is one of the world's leading financial firms and one of the largest banks in the United States.  Bank of America Corporation conducts substantial business within this District.

12.     Defendant Banc of America Investment Services, Inc. ("BAIS"), is incorporated in Florida and its principal executive offices are located in Charlotte, North Carolina.  BAIS is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and Financial Industry Regulatory Authority ("FINRA").  BAIS is a wholly-owned subsidiary of Bank of America Corporation.  BAIS conducts substantial business within this District.

13.     Defendant Banc of America Securities, LLC ("BAS") is a limited liability company incorporated in Delaware, with its principal place of business in Charlotte, North Carolina.  The sole member of BAS is NationsBanc Montgomery Holdings Corporation, which is owned by NB Holdings Corporation, which is in turn owned by Bank of America Corporation.  NationsBanc Montgomery Holdings Corporation is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  NB Holdings Corporation is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  BAS is registered

with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the NYSE and FINRA. BAS conducts substantial business within this District.

14.     Defendants are collectively referred to as "Bank of America."

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over ITC's claims pursuant to the Investment Advisers Act, 15 U.S.C. § 80b-1 *et. seq.*, and 28 U.S.C. §1331. To the extent that the Court has federal question jurisdiction, it also has supplemental jurisdiction under 28 U.S.C. §1367 over the state law claims.

16.     This Court also has subject matter jurisdiction over ITC's claims pursuant to 28 U.S.C. §1332(a). The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, excluding interests and costs.

17.     Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §§1391 (a)(2) and (b)(2), because Defendants are found in and conduct business in the Northern District of Illinois, and some or all of the acts from which this cause of action arises occurred in this District.

## FACTUAL ALLEGATIONS

### Background Of Auction Rate Securities

18.     The term "Auction Rate Security" typically refers to long-term bonds that act like short-term debt. ARS can be either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." ARS generally have long-term maturities, and in the case of preferred stocks, no maturity date.

19.     ARS were first introduced in the 1980s.  The market for ARS grew dramatically and the estimated value of ARS in existence before the auction market's February 2008 collapse was estimated to be over $300 billion.

## Types Of Auction Rate Securities

20.     There are three primary types of ARS:  (1) Auction Preferred Shares of closed-end funds ("APS"), (2) Municipal Auction Rate Certificates ("Municipal ARCS"), and (3) Student Loan-Backed Auction Rate Certificates ("Student Loan ARCS").

21.     APS are equity instruments without a stated maturity that are issued by closed-end funds.  APS are collateralized by the assets in that fund and typically receive ratings from the major rating agencies.  Interest rates are intended to be set in an auction process with auction cycles typically of 7 or 28 days.  Typically, they have a maximum rate, based off of a short-term index, above which the interest rate cannot be set in auction.

22.     Municipal ARCS are debt instruments (typically municipal bonds) issued by governmental entities with a long-term nominal maturity and a floating interest rate that is intended to be reset through an auction process.  Municipal ARCS receive long-term ratings from the major rating agencies and are often backed by monoline insurance.

23.     Student Loan ARCS are long-term debt instruments issued by trusts which hold student loans.  Interest rates are supposed to be set in an auction process and yet typically they have a maximum rate above which the interest rate cannot be set in an auction.  Student Loan ARCS receive long-term ratings from the major rating agencies.

24.     All three types of ARS typically have maximum or default interest rates that are set forth in a prospectus that defines interest rates in the event of auction failure.  Some maximum rates are fixed percentage rates, while others are set pursuant to various formulas.

## The Auction Process For Auction Rate Securities

25.     ARS were marketed at par value at auction, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction.

26.     The auctions were commonly referred to as "Dutch" auctions – one where the price was set at a low level and then increased throughout the course of the auction until all of the auction rate securities at the auction were sold.

27.     During an auction, an investor could submit one of four different orders: (1) a Hold order to keep the shares out of the auction regardless of the new interest rate; (2) a Hold at Rate order, where if the clearance rate was below the bid to hold rate, then the securities were sold; (3) a Sell order, which was to sell the shares at the auction regardless of the clearing rate; and (4) a Bid order, to submit a bid to buy at a new position at a specified minimum interest rate.  Since there was no preference in awarding shares to existing holders and new buyers, there was little practical difference between a Hold at Rate and a Buy order.

28.     At the end of the auction, the rate at which all of the securities were sold, was set uniformly and was called the "clearing rate."  The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction.  If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders.  The auction agent, at the end of the auction, allocated the shares per the formula.  If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus.  This rate was generally lower than the market rate.

29.     Broker-dealers would often engage in a number of practices to influence the auction process, including, for example submitting their own orders to purchase or sell shares for their own accounts.

**Result Of Failed Auctions**

30.     The auction failed if there were not enough orders to purchase all the shares being sold at the auction.  In that situation, the rate was set to a "maximum rate" which was prescribed in the instrument's prospectus.  If the auction failed, then none of the current shareholders could sell their shares, regardless of the type of order they issued.  The maximum rate for many ARS was relatively small.

31.     An auction failure would create a liquidity crisis for ARS owners who, unable to sell their shares, would receive limited outside interest for their illiquid investments.

**Bank Of America Made Misrepresentations And Omissions To ITC Regarding The Liquidity And Risks Associated With ARS**

32.     ARS were profitable for Bank of America and its financial advisors who sold the securities.

33.     Bank of America falsely represented to ITC that ARS were highly liquid, safe investments for short-term investments and were equivalent to cash or money market funds. These false statements were reinforced when ITC would receive its account statements, which listed the ARS as "cash."  A copy of the December 2007 Account Statement is attached hereto as Exhibit A.

34.     Bank of America failed to disclose to ITC certain facts about ARS.  Bank of America failed to disclose that ARS were not cash alternatives, like money market funds, and were instead, complex long-term financial instruments with 30-year maturity dates, or longer.

35.     ITC's ARS all have maturity dates of at least 30 years.

36.     Bank of America failed to disclose to ITC that the ARS it was selling were only liquid at the time of sale because Bank of America, and other broker-dealers, were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability.  When Bank of America and the other broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the ARS sold by Bank of America became illiquid.

37.     Bank of America failed to disclose to ITC the material facts about Bank of America's role in the auctions and the auction market in which these securities were traded. Bank of America failed to disclose to ITC that in connection with the sale of ARS, Bank of America was simultaneously acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate; on behalf of the investor, who was seeking the highest possible return; and on its own behalf, to maximize the return to Bank of America on its holdings of the ARS.

38.     Bank of America failed to disclose to ITC that the auctions it was conducting were not governed by arms-length transactions but rather suffered from systemic flaws and manipulative practices.

39.     Bank of America failed to disclose to ITC that it and other broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions.

40.     Bank of America failed to disclose to ITC that without its manipulation of the auction market, many auctions would have likely failed.  Auction failures would have resulted in investors knowing the actual risk and liquidity problems associated with ARS.

41.     Bank of America failed to disclose to ITC that Bank of America had determined that it and other broker-dealers were likely to withdraw their support for the periodic auctions which would result in a "freeze" on the ARS market.

42.     Bank of America failed to disclose to ITC the risk of failed auctions or the collapse of the auction rate securities market, until after the ARS market failures in February 2008.

## ARS Market Collapsed In February 2008

43.     On February 13, 2008, 87% of all ARS auctions failed when Bank of America, and the other major broker-dealers refused to continue to support the auctions.

44.     The ARS market subsequently collapsed as a result of the withdrawal of support by Bank of America and the major broker-dealers.

45.     ITC's outstanding ARS securities, which were exclusively Student Loan ARCS, were rendered illiquid as a result of the market collapse.

46.     On May 4, 2008, the New York Times reported that Student Loan ARCS are the "hardest to sell" in alternative markets, where discounts for such securities are "25 percent or more."

## ITC Justifiably Relied On Bank Of America's Misrepresentations

47.     Bank of America collected fees in connection with operating the ARS auctions, in addition to its customary fees.

48.     ITC's investment goals and objectives focused on liquidity at all times during the period that Bank of America acted as ITC's investment adviser.

49.     Bank of America represented that it understood ITC's investment goals and objectives and managed ITC's investments in accordance with those goals and objectives.

50. ITC would periodically provide cash to Bank of America to select the appropriate investment vehicles consistent with ITC's investment goals and objectives.

51. Bank of America advised ITC to invest in Student Loan ARC.

52. Bank of America represented to ITC that Student Loan ARC were liquid investment vehicles that were consistent with ITC's investment goals and objectives.

53. Bank of America had advised ITC to invest $22,900,000 in Student Loan ARC, as of February 2008.

54. Bank of America selected the following Student Loan ARC:

| | Security Description | Par Value |
|---|---|---|
| 1. | NELNET Education Loan Funding NELF 2003-1 A-6 | $2,500,000 |
| 2. | EFSI Student Loan Series 2005 A-1 (BRAZOS HIGHER ED-SERVICER) | $5,000,000 |
| 3. | NorthStar Education Finance Inc. 2002 A-5 | $5,000,000 |
| 4. | Panhandle Plains Higher Ed Auth 2005 A-1 | $5,000,000 |
| 5. | Brazoz Student Finance 2004 A-4 | $ 900,000 |
| 6. | Panhandle Plains Higher Ed Auth 2004 A-2 | $2,000,000 |
| 7. | NorthStar Education Finance Inc. 2002 A-3 | $2,500,000 |
| | Total Value | $22,900,000 |

55. As a result of Bank of America's materially false and misleading statements and failures to disclose, ARS sold to ITC by Bank of America traded at artificially inflated prices.

56. Bank of America misrepresented the integrity of the auction market and the market price of ARS securities. Bank of America materially misled ITC to purchase and continue to hold ARS.

57. Bank of America's statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the auction market and the ARS that it sold.

58. ITC acted in reliance on Bank of America's material misrepresentations and omissions which caused ITC to continue to hold ARS sold by Bank of America at artificially inflated prices.

59. As a result of the auction failures, ITC's investments are illiquid and ITC is unable to liquidate its ARS investments without a substantial loss.

### ITC Exercised Its Rights To Rescind and Void Its Purchase of ARS From Bank of America

60. ITC first learned in April 2008, that the ARS purchased from Bank of America could be rescinded because of violations of Illinois and federal securities laws.

61. ITC demanded that Bank of America rescind the ARS purchases during numerous telephone and in-person conversations that occurred in April 2008 and May 2008.

62. Specifically, on May 23, 2008, Richard Werner, ITC's President, met with Bank of America representatives Robert Kastenholz and Scott Carlson at ITC's headquarters. During the meeting, Werner told Kastenholz and Carlson at least six times that ITC wanted Bank of America to repurchase the ARS. Kastenholz and Carlson denied ITC's request.

63. On September 5, 2008, ITC exercised its rights under the Illinois Securities Act to void and rescind its ARS investments. A copy of ITC's letter making that

election is attached hereto as Exhibit B. ITC's letter was sent to Bank of America by messenger and Federal Express. Bank of America did not respond to ITC's rescission request.

64.     ITC has made reasonable efforts to settle this dispute, but Bank of America has refused to repurchase any of the illiquid ARS.

65.     Bank of America has failed and refused to return ITC's investment.

**Bank of America Has Agreed To Repurchase Nearly $5 Billion In Illiquid ARS Pursuant to Settlement Agreements With The SEC and Various States**

66.     On September 10, 2008, Bank of America settled in principle claims with the Massachusetts Securities Division that arose from Bank of America's actions concerning ARS investments, that are similar to those raised in this lawsuit.

67.     A proposed term of the settlement is that Bank of America agreed to repurchase approximately $4.5 billion worth of illiquid ARS held by nearly 5,500 Bank of America customers. Under the proposed settlement, the only Bank of America customers that would be compensated under the September settlement are individual investors, trusts, and businesses that had account values up to $10 million and charities that had account values up to $25 million.

68.     On October 8, 2008, Bank of America also agreed to settle in principle claims with the SEC, New York Attorney General, and other regulators.

69.     A proposed term of the settlement is that Bank of America agreed to pay a $50 million penalty and increased the amount of illiquid ARS that it would repurchase to $4.7 billion. The only Bank of America customers that would be compensated under the October settlement are individual investors, trusts, and businesses that had account values up to $15 million and charities that had account values up to $25 million.

70.     ITC is ineligible to participate in either of the settlements because its ARS account was valued at nearly $23 million.

**COUNT I**
**Rescission and Related Relief Under**
**Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et. seq*.**

71.     ITC repeats and realleges the allegations set forth in paragraphs 1-70 above as if set forth herein.

72.     Bank of America is an investment adviser under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et. seq*., and acted as ITC's investment adviser at all relevant times.

73.     Bank of America engaged in the business of advising ITC directly as to the value of securities and as to the advisability of investing in, purchasing, or selling securities as defined at 15 U.S.C. § 80b-2(11).

74.     Bank of America received special compensation for its services related to auction rate securities.

75.     Under the Investment Advisers Act, Bank of America, as an Investment Adviser, owed ITC a fiduciary duty to fully and fairly disclose all material facts, and an affirmative obligation to follow ITC's investment goals and objectives in making all investments.

76.     Bank of America breached its fiduciary duty to ITC by making misrepresentations regarding the suitability of ARS investments for ITC.  Bank of America concealed and omitted material facts concerning Bank of America's actions as financial advisors to ITC, thereby deceiving ITC with full knowledge that such representations, or omissions, resulted in false and misleading information.  Such false and misleading information led ITC to

believe both that its ARS investments were made in accordance with its investment goals and objectives and that its ARS investments were liquid.

77.     As a result of Bank of America's breach of fiduciary duty, ITC's purchase, investment, and acquisition of ARS securities are void under the Investment Advisers Act, 15 U.S.C. § 80b-15(b).

78.     ITC, therefore, seeks a declaratory judgment that the ARS transactions with Bank of America are void.  ITC also seeks an accounting and restitution, as well as disgorgement of all profits made by Bank of America due to is conduct in violation of the Investment Advisers Act.

WHEREFORE, Independence Tube prays for judgment against Bank of America as follows:

A.     Rescinding the investment agreement with Bank of America and requiring Bank of America to return the funds that ITC entrusted to Bank of America;

B.     Disgorgement of all profits earned by Bank of America through the purchase and sale of ARS on behalf of ITC;

C.     Awarding compensatory and punitive damages;

D.     Awarding pre- and post-judgment interest;

E.     Awarding ITC reasonable attorneys' fees and costs; and

F.     Awarding ITC such further relief as the Court deems just and proper.

**COUNT II**
**Rescission and Related Relief Under**
**The Illinois Securities Act, 815 ILCS 5/1 et. seq.**

79.     ITC repeats and realleges the allegations set forth in paragraphs 1-78 above as if set forth herein.

80.     Bank of America violated the Act by, among other things:

a) engaging in transactions, practices, and a course of business in connection with the sale of ARS which worked or tended to work a fraud or deceit on ITC;

b) obtaining money through the sale of ARS to ITC by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

c) employing devices, schemes, and artifices to defraud ITC in connection with the purchase and sale of ARS; and

d) offering and selling ARS in noncompliance with the Act.

81. Bank of America is a securities "dealer" as defined in the Act.

82. ITC properly and timely exercised its right to void and rescind its ARS investments.

83. Bank of America has failed and refused to return ITC's investment.

84. Bank of America's actions constitute a violation of the Illinois Securities Act of 1953. 815 ILCS 5/1, *et. seq.*

WHEREFORE, Independence Tube prays for judgment against Bank of America as follows:

A. Rescinding the investment agreement with Bank of America and requiring Bank of America to return the funds that ITC entrusted to Bank of America;

B. Disgorgement of all profits earned by Bank of America through the purchase and sale of ARS on behalf of ITC;

C. Awarding pre- and post-judgment interest;

D. Awarding ITC reasonable attorneys' fees and costs; and

E. Awarding ITC such further relief as the Court deems just and proper.

## COUNT III
## Breach of Fiduciary Duty

85. ITC repeats and realleges the allegations set forth in paragraphs 1-84 above as if set forth herein.

86. ITC placed trust and confidence in Bank of America by vesting it with discretion over its investment accounts. ITC's trust and confident was based upon Bank of America's reputation as financial experts. ITC reasonably relied upon the purported expertise of Bank of America in bestowing trust and confidence in Bank of America.

87. Bank of America accepted discretion over ITC's investment accounts and accepted the trust and confidence that ITC bestowed upon it and thereby assumed a fiduciary duty to ITC.

88. Bank of America breached its fiduciary duty to ITC by investing in ARS vehicles that did not comply with ITC's stated investment goals and objectives.

89. Bank of America further breached its fiduciary duty by misleading ITC into believing that ARS investments were safe and liquid.

90. ITC has suffered and will suffer damage and financial loss as a result of Bank of America's breach of fiduciary duty owed to ITC.

WHEREFORE, Independence Tube prays for judgment against Bank of America as follows:

A.     Rescinding the investment agreement with Bank of America and requiring Bank of America to return the funds that ITC entrusted to Bank of America;

B.     Disgorgement of all profits earned by Bank of America through the purchase and sale of ARS on behalf of ITC;

C.     Awarding compensatory and punitive damages;

D.     Awarding pre- and post-judgment interest;

E.     Awarding ITC reasonable attorneys' fees and costs; and

F.     Awarding ITC such further relief as the Court deems just and proper.

**COUNT IV**
**Fraud**

91.     ITC repeats and realleges the allegations set forth in paragraphs 1-90 above as if set forth herein.

92.     Bank of America made material misrepresentations or omissions to ITC concerning its ARS investments, with knowledge that those misrepresentations or omissions would be justifiably relied upon by ITC in connection with the decision not to sell its ARS investments prior to the time that the auctions for such securities failed in February 2008.

93.     Bank of America knowingly provided ITC with false information regarding the liquidity of ITC's ARS investments.  Bank of America stated that ARS was equivalent to money market investments or cash.

94.     Bank of America falsely led ITC to believe that its investments in the ARS conformed with ITC's stated investment goals objectives, although Bank of America knew or

should have known that the illiquidity of the ARS did not meet ITC's investment goals and objectives.

95. Bank of America failed to disclose the inherent deficiencies in ARS investments and failed to disclose that ARS auctions had failed in the past.

96. ITC justifiably relied upon Bank of America's misrepresentations and omissions of material fact, leading ITC to suffer damages and financial loss.

WHEREFORE, Independence Tube prays for judgment against Bank of America as follows:

A. Rescinding the investment agreement with Bank of America and requiring Bank of America to return the funds that ITC entrusted to Bank of America;

B. Disgorgement of all profits earned by Bank of America through the purchase and sale of ARS on behalf of ITC;

C. Awarding compensatory and punitive damages;

D. Awarding pre- and post-judgment interest;

E. Awarding ITC reasonable attorneys' fees and costs; and

F. Awarding ITC such further relief as the Court deems just and proper.

## COUNT V
## Negligent Misrepresentation

97. ITC repeats and realleges the allegations set forth in paragraphs 1-96 above as if set forth herein.

98. Bank of America had an affirmative duty to provide ITC with all material information regarding the risk associated with ARS investments, Bank of America's role in conducting ARS auctions, and the risk associated with the potential failure of ARS auctions.

99.     Bank of America did not exercise due care in obtaining or communicating information regarding ARS investments to ITC.

100.    Bank of America negligently made material representations in the course of its business or in which it had a pecuniary interest to ITC.

101.    Bank of America stated that ARS investments were equivalent to money market investments or cash.

102.    Bank of America failed to disclose the deficiencies inherent in ARS investments and failed to disclose the fact that ARS auctions had failed in the past.

103.    Bank of America knew or should have known that those representations were false.

104.    Bank of America made those representations with the intention that ITC would be induced to act.

105.    ITC justifiably relied on Bank of America's misrepresentations and omissions of material fact, leading ITC to suffer damages and financial loss.

WHEREFORE, Independence Tube prays for judgment against Bank of America as follows:

A.      Rescinding the investment agreement with Bank of America and requiring Bank of America to return the funds that ITC entrusted to Bank of America;

B.      Disgorgement of all profits earned by Bank of America through the purchase and sale of ARS on behalf of ITC;

C.      Awarding compensatory and punitive damages;

D.      Awarding pre- and post-judgment interest;

E.      Awarding ITC reasonable attorneys' fees and costs; and

F.      Awarding ITC such further relief as the Court deems just and proper.

**INDEPENDENCE TUBE DEMANDS TRIAL BY JURY**

Dated:  October 21, 2008               Respectfully submitted,

s/Nicholas A. Gowen
William G. Schopf
Jose A. Lopez
Nicholas A. Gowen
SCHOPF & WEISS LLP
One South Wacker Drive
28th Floor
Chicago, Illinois 60606-4617
Tel:  312.701.9300
Fax:  312.701.9335
schopf@sw.com
lopez@sw.com
gowen@sw.com